**FIRST DIVISION**
**ELLINGTON, C. J.,**
**PHIPPS, P. J., and DILLARD, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**May 18, 2012**

# In the Court of Appeals of Georgia

A12A0390. GOODEN v. THE STATE.

PHIPPS, Presiding Judge.

Jimmy Gooden was convicted of committing against his 17-year-old daughter J. G. the crimes of forcible rape, incest, terroristic threat, and simple battery. On appeal, Gooden challenges the denial of his motion for mistrial, which asserted that J. G.'s credibility had been impermissibly bolstered. Gooden challenges also the denial of his motion for new trial, which asserted that his trial counsel had rendered ineffective assistance. We affirm.

At the jury trial, the state presented the following evidence. The underlying incident occurred on the night of August 10, 2002. For about two years, J. G. had been living with Gooden, his wife, and their two children. And that night, Gooden, his wife, and the children were all out of town. J. G. and a classmate had gone to church, then

returned to J. G.'s residence. At about 11:30, while J. G. and her classmate were talking in the den, Gooden unexpectedly arrived. J. G. told her classmate to hide because her father had specifically told her that she could not have any visitor at the residence that night. Her classmate scurried into a room adjacent to the den.

J. G. testified that, while she was in the den with Gooden, he ordered her to take off her clothes and get onto the daybed. Given his prior threats to kill her if he ever got arrested for sexually abusing her, she complied out of fear. He took off his pants and engaged in sexual intercourse with her, while she prayed aloud for God to help her. Afterwards, Gooden discovered J. G.'s classmate hiding in the adjacent room. He locked her in that room, returned to the den, began striking J. G., and asked why the girl was in the home, despite his explicit instruction that she (J. G.) have no company that night. J. G. explained that she had been afraid to be alone. Gooden left the residence, but before walking out, warned J. G. that if the girl was not gone by the time he returned, he would hurt them both. Terrified, J. G. called her older sister[1] for help.

J. G.'s sister arrived at the residence in about 10 minutes and drove J. G. and her classmate to a police station, where J. G. gave a statement to a police detective.

---

[1] Gooden was the father of both girls, who had different mothers.

The detective pursued warrants for Gooden's arrest and for a search of his residence. Also, a police officer was posted outside Gooden's residence to await his return and to then summon other officers.

That same night, J. G. was taken to a hospital, where a pediatrician examined her. He found a fresh tear of her vaginal tissue, which injury, he opined, was consistent with forcible abuse. Inside the vaginal vault, the pediatrician found a copious amount of seminal fluid, a sample of which he microscopically examined and detected motile sperm.

At about 8:00 a. m., Gooden returned to his residence. The awaiting officer detained him at his driveway, until summoned officers arrived. One of the officers explained to Gooden why he was being detained; Gooden was "cooperative," and he gave police consent to search his residence and his vehicle. With the searches underway and the warrants meanwhile obtained, another officer arrived to take Gooden into custody. That officer advised Gooden that he was under arrest pursuant to a warrant, then transported him to the police station. There, Gooden talked briefly to officers and wrote a partial police statement.

To corroborate J. G.'s account, the state presented the testimony of J. G.'s classmate, similar transaction evidence, and evidence of prior difficulties. J. G.'s

3

classmate recalled that she and J. G. were watching television in the den when Gooden arrived unexpectedly. While hiding in an adjacent room, the classmate heard Gooden tell J. G. to turn off the television and take off her clothes. Next, the classmate heard J. G. pleading something to the effect: "[W]hy me, Lord . . . oh, my God, help me, Lord"; while J. G.'s pleas were ongoing, Gooden repeatedly told J. G. to "stop saying that" because "you [are] making me not want to do this." Thereafter, the classmate testified, Gooden came to the door of the room in which she was hiding, locked her inside, told J. G. to convince her that what she had heard was the television, then left the residence.

As similar transaction evidence to show Gooden's bent of mind, course of conduct, modus operandi, and intent, the state presented the testimony of J. G.'s sister, who picked up J. G. and her classmate that night. She stated that when she was about five or six years old and living with Gooden and her mother, Gooden sometimes fondled her genital area, which conduct escalated to sexual intercourse by the time she was about 12 years old, when her mother left Gooden.

As evidence of prior difficulties, the state presented J. G.'s testimony that Gooden had repeatedly forced sexual intercourse upon her during the six months immediately before the night in question. J. G. further testified that Gooden had forced

4

sexual intercourse on her previously, when she was between eight and twelve years old and living with Gooden and another former wife.

Gooden took the stand and denied the charged offenses pertaining to J. G., as well as J. G.'s allegations of prior sexual abuse. In addition, Gooden denied J. G.'s sister's allegations of prior sexual abuse. Regarding J. G.'s sister, however, Gooden admitted that he had been charged with child molestation and thereupon pled guilty to a reduced charge of simple battery.

Gooden's account of the night in question was that, after arriving home at about midnight, he began talking with J. G. in the den. He heard a noise in the adjacent room and was surprised to discover J. G.'s classmate hiding in there. He had explicitly told his daughter that she could not have a visitor at the house that evening, so he asked his daughter for an explanation. Gooden testified that "she just started saying, oh, God, help me, please help me." Gooden stated that he was so angered that his daughter had disobeyed him that he left the premises, admonishing his daughter not to have any visitor by the time he returned. When he came back the next morning, he was approached by police. Gooden acknowledged that he consented to a search of his home and vehicle and that, when officers at the police station asked him whether he wanted to talk to them, he talked to them briefly. Gooden testified further that,

because he had nothing to hide, he began writing a police statement. He stopped, however, when a police officer suggested that he wait for an attorney.

1. Gooden contends that the trial court should have granted his motion for mistrial because the pediatrician gave testimony that bolstered J. G.'s credibility.

The pediatrician was qualified, without objection, to testify as an expert in the "area of evaluation and treatment of assault victims." He recounted that, prior to conducting the physical examination of J. G., he interviewed her by following an assault checklist, designed to obtain both general medical information and information specific to the event in question. This exchange between the prosecutor and pediatrician followed:

Q: Specifically on your checklist, was there anything that was consistent with a victim of sexual assault?

A: I'm sorry, do you mean in terms of the history or in terms of the physical exam?

Q: In terms of the history. Let's stick with the history.

A: I mean, she seemed reasonable, she was fearful, but I believed she was telling me the truth.

Gooden's lawyer objected, and the court immediately charged:

6

Ladies and gentlemen, as instructed in your preliminary instructions, credibility is strictly a matter for the jury, strictly a matter for the jury. And I caution you, I caution the witness, I caution the State. So the relevance of any person's testimony on that fact is strictly – well, it is strictly irrelevant. And, therefore, that is ordered stricken, that testimony. And you are ordered to strike it from your mind, recognizing that it is solely for you, you are the sole judges of the credibility of witnesses.

The court asked Gooden's lawyer whether he had any "further requests," and the lawyer responded that he had a matter he wished to pursue outside the jury's presence. And with the jury thereafter outside the courtroom, a defense motion for mistrial was argued, then denied.

"Whether to grant a motion for mistrial is within the trial court's sound discretion, and the trial court's exercise of that discretion will not be disturbed on appeal unless a mistrial is essential to preserve the defendant's right to a fair trial."[2]

"A witness's credibility is exclusively a matter for the jury,"[3] and "in no circumstance may a witness's credibility be bolstered by the opinion of another, even

---

[2] *Childs v. State*, 287 Ga. 488, 492 (4) (696 SE2d 670) (2010) (citation and punctuation omitted).

[3] *Head v. State*, 253 Ga. App. 757 (1) (560 SE2d 536) (2002); see *Goldstein v. State*, 283 Ga. App. 1, 9 (3) (c) (640 SE2d 599) (2006).

an expert, as to whether the witness is telling the truth."[4] Thus, the pediatrician's testimony that he believed that J. G. had told him the truth was improper.[5] But given the trial court's immediate curative action – reminding the jury that credibility was exclusively its province and instructing the jury that the pediatrician's testimony relating to J. G.'s credibility was improper, devoid of any relevance, and stricken, we find no abuse of discretion in the trial court's refusal to grant a mistrial.[6]

2. Gooden contends that the trial court erred by denying his motion for new trial based on his claim of ineffective assistance of counsel. To prevail on an ineffectiveness claim, a defendant must establish, pursuant to *Strickland v. Washington*,[7] that counsel's performance was deficient and that the deficient

---

[4] *Goldstein*, supra; see *Head*, supra.

[5] See *Goldstein*, supra (police officer's testimony that the victim "was very consistent . . . I was very convinced that this had happened to her. I don't believe that she could have made it up" was improper); *Head*, supra (testimony by a "victim's advocate" that she believed the victim was improper).

[6] See *Cook v. State*, 276 Ga. App. 803, 806-807 (3) (625 SE2d 83) (2005) (trial court's curative instruction for jury to disregard improper testimony was the proper corrective measure and trial court did not abuse its discretion by refusing to grant mistrial); *Head*, supra (same); see also *Goldstein*, supra (mistrial was not mandated where trial counsel objected and court gave brief curative instruction).

[7] 466 U. S. 668 (104 SC 2052, 80 LEd2d 674) (1984).

performance was prejudicial to his defense.[8] Both the performance and the prejudice prongs of the ineffectiveness inquiry are mixed questions of law and fact.[9] In reviewing a trial court's conclusion regarding a claim of ineffective assistance of counsel, this court upholds the trial court's factual findings unless they are clearly erroneous; we review the trial court's legal conclusions de novo.[10]

Gooden asserts that the prosecutor elicited from the arresting police officer impermissible testimony concerning his post-arrest silence. Gooden cites this portion of the state's direct examination of that officer concerning the course of events surrounding taking Gooden into custody:

Q:   Did you ever go to [Gooden's residence]?

A:   Yes, I did. To make contact, place Mr. Gooden into custody.

Q:   And do you remember if any other officers were present when the Defendant was placed into custody?

A:   [A second officer] was present, and I believe [a third officer] was present.

---

[8] *Suggs v. State*, 272 Ga. 85, 87 (4) (526 SE2d 347) (2000).

[9] Id. at 87-88 (4).

[10] Id. at 88 (4).

9

Q: *When you all were there to detain the Defendant, did he make any statements?*[11]

A: No, ma'am, not to me.

The prosecutor asked this witness no other question about whether Gooden made any statement, turning instead to what transpired when J. G. was at the hospital, then to specifics about the arrest warrant.

Citing *Mallory v. State*[12] and *Reynolds v. State*,[13] Gooden maintains on appeal that the prosecutor's question, italicized above, together with the answer, impermissibly injected his post-arrest silence into the proceedings and that his trial counsel should have objected thereto.[14] The transcript of the hearing on motion for new trial does not contain trial counsel's testimony revealing his reason for not

---

[11] (Emphasis added.)

[12] 261 Ga. 625 (409 SE2d 839) (1991), overruled on other grounds, *Clark v. State*, 271 Ga. 6, 9-10 (5) (515 SE2d 155) (1999).

[13] 285 Ga. 70 (673 SE2d 854) (2009).

[14] See, e.g., *Collins v. State*, 289 Ga. 666, 667-668 (2) (715 SE2d 136) (2011) (recognizing that a question posed at trial by the prosecutor about appellant's failure to talk to police may be improper under *Mallory*).

objecting.[15] But for reasons that follow, we find no error in the trial court's rejection of Gooden's ineffectiveness claim.

In *Mallory*, the Supreme Court of Georgia held that "in criminal cases, a *comment upon a defendant's silence or failure to come forward* is far more prejudicial than probative."[16] The Court instructed: "such a comment will not be allowed even where the defendant has not received Miranda warnings and where he takes the stand in his own defense."[17] Later, in *Reynolds*, the Court explained:

> This holding in *Mallory* is merely the recognition that the General Assembly has, by its enactment of OCGA § 24-3-36,[[18]] formulated an evidentiary rule which dictates that *under certain circumstances*, a defendant's silence or inaction will rise to the level of an admission; certainly in the situation of a criminal defendant, this failure to speak or act will most often be judged as evidence of the admission of criminal responsibility. Thus, the element of prejudice is indisputable.[19]

---

[15] Gooden's post-conviction lawyer reported at the new trial hearing that Gooden's trial lawyer was deceased.

[16] *Mallory*, supra at 630 (5) (emphasis supplied).

[17] Id.

[18] ("Acquiescence or silence, when the circumstances require an answer, a denial, or other conduct, may amount to an admission.")

[19] *Reynolds*, supra at 71 (emphasis supplied).

Notably, in the recent case of *Rogers v. State*,[20] the Court analyzed the appellant's "refusal to answer a particular question" during the course of a lengthy *Mirandized* statement.[21] Such circumstances, the Court concluded, did not amount to "an invocation of the right to silence so as to raise the concerns addressed in *Mallory v. State*."[22]

Analysis of the pertinent circumstances underlying this case demands the same conclusion. The uncontroverted evidence showed that, while Gooden was being detained at his residence, he remained cooperative with police, including consenting to searches of his residence and vehicle. Even after being formally arrested and transported to jail, Gooden continued to answer police questions and provided a partial written statement. Given these circumstances, the question and answer at issue did not show that Gooden thereby made "an invocation of the right to silence so as to raise the concerns addressed in *Mallory*."[23] Indeed, the prosecutor made no effort

---

[20] 290 Ga. 401 (721 SE2d 864) (2012).

[21] Id. at 404-406 (2).

[22] Id. at 406 (2) (punctuation omitted).

[23] Id. (punctuation omitted); see *Gilyard v. State*, 288 Ga. 800, 802-803 (2) (708 SE2d 329) (2011) (because appellant spoke with police without ever invoking his right to remain silent, the prosecutor's line of questioning did not constitute impermissible commentary on appellant's right to remain silent) (contrasting

12

during the state's closing argument to persuade the jury to infer Gooden's guilt from the arresting officer's tempered testimony – that Gooden had made no statement, at least, not to him.[24] "Accordingly, analyzing the [contested question and answer] in context, it is very unlikely to have had any impact on the jury's determination of guilt."[25]

Moreover, the evidence of Gooden's guilt was strong.[26] The incident underlying the sexual charges occurred at a time when Gooden admittedly believed he was alone with J. G. But J. G.'s classmate was hiding in an adjacent room, and her account of what occurred corroborated that of J. G. Additionally, J. G.'s account was

---

*Mallory*).

[24] See generally *Brewer v. Hall*, 278 Ga. 511, 514 (3) (603 SE2d 244) (2004); *Hardy v. State*, 301 Ga. App. 115, 116 (2) (686 SE2d 789) (2009) (if the testimony concerning remaining silent is made during a narrative on the part of authorities of a course of events and apparently was not intended to, nor did it have the effect of, being probative on the guilt or innocence of the defendant, then the testimony is not prejudicial).

[25] *Brewer*, supra; see *Rogers*, supra; *Gilyard*, supra.

[26] See generally *Brewer*, supra (finding evidence strong, where appellant was charged with child molestation and burglary after he broke into a house and made forcible sexual advances on a twelve year-old girl, whose friend, also a twelve year-old girl, witnessed the incident; and both girls identified appellant as the perpetrator before and during trial).

corroborated by medical findings, similar transaction evidence, and evidence of prior difficulties.

Thus, Gooden has failed to show the prejudice required under *Strickland* – a reasonable probability that, but for trial counsel's failure to object to the cited question by the prosecutor, the outcome of his trial would have been different.[27] The trial court therefore did not err in rejecting his claim of ineffective assistance of trial counsel.[28]

*Judgment affirmed. Ellington, C. J., and Dillard, J., concur.*

---

[27] See *Miller v. State*, 285 Ga. 285, 286 (676 SE2d 173) (2009). See generally *Rogers*, supra; *Gilyard*, supra; *Brewer*, supra (where the improper testimony from the police officer was harmless beyond a reasonable doubt, defendant was not prejudiced by his trial counsel's failure to object to the testimony); *Hardy*, supra.

[28] See *Suggs*, supra.

14