**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 20, 2013**

# In the Court of Appeals of Georgia

A13A1321. OTTLEY v. THE STATE.

MᴄMɪʟʟɪᴀɴ, Judge.

Winfred Ottley appeals the denial of his motion for new trial after a jury convicted him of three counts of cruelty to children, one count of sexual battery, two counts of aggravated assault, two counts of rape, one count of child molestation, one count of incest, and two counts of aggravated child molestation.[1] On appeal, Ottley argues that the evidence was insufficient to support his convictions and that he received ineffective assistance of counsel. Although we find the evidence sufficient

---

[1] The trial court merged some of the counts for sentencing, but Ottley was given a life sentence as a recidivist under OCGA § 17-10-7 (a) on the counts of aggravated child molestation and rape, and concurrent sentences of varying periods of years on the other counts.

to support his convictions, we reverse for a new trial because we find that Ottley has carried his burden of demonstrating that he received ineffective assistance of counsel.

Viewed in the light most favorable to support the verdict,[2] the evidence showed that at the pertinent time, Ottley was married to the victim's mother, but they separated in November 2008 and were in the process of divorcing at the time of the trial in May 2010. The victim was the mother's child from a previous marriage. On May 9, 2009, after the Ottleys separated, the victim reported to her mother and grandmother that Ottley had been molesting her since 2006, when she was nine years old. The victim told her mother that Ottley put a knife to her throat, threatened her, made her take off her pants and put his penis inside her. She later told her mother that the last time it had happened was January 2009 when she was visiting Ottley.

At trial, the victim testified that in May 2006, she was at home with Ottley and her younger brother while her mother was in Brazil on business. The first time Ottley touched her, he came into her room one night, put a knife to her throat, and ordered her to take off her pants or he would kill her. He then put his penis in her "private part" (the "First Incident"). She said that this happened again, but she could not remember how many times, in either his bedroom or hers, but he did not use a knife.

---

[2] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

The last time it happened, in January 2009, the victim was 12 years old, and Ottley was staying at a friend's house following his separation from the victim's mother. Ottley was hosting the victim and her little brother during a planned weekend visit. In that incident, Ottley put his mouth on the victim's private part (the "Last Incident").

The victim's family members testified that the victim's behavior toward Ottley changed around the time of the First Incident. Although they had more of a father-daughter relationship before that time, the victim later began to avoid Ottley. She would hang her head, cast her eyes downward, tear up, and act nervous and frightened when he was around. Her mother said that at the time, she attributed the victim's behavior to her sensitivity to criticism and her ADHD (Attention Deficit Hyperactivity Disorder), and she outlined medications that the child had taken for that condition. The family members also testified that the victim's demeanor changed around the pertinent time: before she was a happy child, but later became "sensitive," "stiff," "withdrawn," and "saddened." And in the summer of 2009, the victim's stepmother caught her masturbating.

On May 12, 2009, a few days after the victim's outcry to her mother, the victim was examined by her family pediatrician, Dr. Richard Mansfield. After she described

3

the incident with the knife to Dr. Mansfield, he conducted a pelvic examination. He had never conducted such an examination on the victim before because there was no reason to do so. During that examination, he noticed an irregularity or asymmetry on her hymen, which he described as a scar and which he said indicated blunt trauma to the area. Dr. Mansfield found that this evidence supported a finding of sexual trauma or abuse. He testified that the condition of her hymen would not occur from everyday child-like activities such as riding a bike, jumping, or gymnastics. Dr. Mansfield testified, however, that the child's hymen was intact.

The victim was also examined by Cathy Cooley, a nurse practitioner in public health and a sexual assault nurse examiner ("SANE"), on May 19, 2009. Cooley was qualified as an expert in sexual assault examinations of pediatric victims. Cooley explained that before examining the victim, she first got a history of the situation from the victim and her mother. The victim told Cooley that the incidents had happened numerous times over a three-year period, and she described some of the acts involved.

Cooley stated that the first thing she noticed during her physical examination of the victim was that the opening to her vagina was gaping open, and "normally you don't see that except on a [30-year-old] that's had a couple of children." She observed

that the labia was "stretched," "flaccid" and "non-resilient." In addition, she found evidence of a "wrinkle wound" in one area of the victim's vulva, which she said indicated repetitive, skin-to-skin friction. Cooley also observed scarring on the victim's hymen.[3] She opined that the scarring was caused by blunt penetrating trauma. She further testified that the injuries could not have been caused by masturbation, horse back riding, gymnastics, or consensual sex.

Additionally, Detective Sherry Ziegler of the Columbus Police Department videotaped an interview she conducted with the victim, and that recording was played for the jury. In that interview, the victim described the First Incident and told Ziegler that it had happened around 15 or 20 times. She also described some of those other incidents. But in describing the Last Incident from January 2009, the victim told Ziegler that Ottley put his private part in her private part, and she said that the only place Ottley put his mouth was on her chest.

Following his convictions, Ottley filed a motion for new trial, and this appeal followed the denial of that motion.

---

[3] Cooley showed the jury photographs of the victim's genital area and described all of these observations in detail.

1. Ottley enumerates as error that the evidence was insufficient to support his convictions. In support of this argument, he points to contradictions and inconsistencies in the evidence and attacks the victim's credibility.

However,

> [w]hen the appellate courts review the sufficiency of the evidence, they do not re-weigh the evidence or resolve conflicts in the testimony; instead they defer to the jury's assessment of the weight and credibility of the evidence. Appellate courts determine whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

(Citations and punctuation omitted.) *Parker v. State*, 320 Ga. App. 319, 319 (1) (741 SE2d 159) (2013). And "as long as there is some evidence, even though contradicted, to support each necessary element of the [S]tate's case, the verdict will be upheld." (Citation and punctuation omitted.) *Anderson v. State*, 315 Ga. App. 679, 682 (1) (727 SE2d 504) (2012). Therefore, "[a]rguments about discrepancies in the victim's testimony and credibility and other factual issues relate entirely to matters within the exclusive province of a jury." (Citation and punctuation omitted.) *Parker*, 320 Ga. App. at 321 (1). "And any inconsistencies between the victim's trial testimony and her out-of-court statements were issues of witness credibility that were solely within

6

the province of the jury and play no part in this [C]ourt's sufficiency of the evidence review." (Citation and punctuation omitted.) *Chamblee v. State*, 319 Ga. App. 484, 485 (735 SE2d 810) (2012).

Ottley also argues that the evidence was insufficient because it did not exclude every other reasonable hypothesis save that of his guilt. But "[Ottley's] reliance upon the reasonable hypothesis rule, set forth in OCGA § 24-4-6, is misplaced, as this rule applies only when the evidence is entirely circumstantial." (Citation omitted.) *Cubia v. State*, 298 Ga. App. 746, 748 (1) (681 SE2d 195) (2009). "Because the victim's testimony provided *direct* evidence of [Ottley's] guilt, the reasonable hypothesis rule is not at issue here." (Citation omitted; emphasis in original.) *Mack v. State*, 294 Ga. App. 518, 519 (669 SE2d 487) (2008).

Based upon our review of the record, we find that the evidence presented at trial, when viewed in the light most favorable to the verdict, was sufficient to authorize a rational jury to find Ottley guilty beyond a reasonable doubt of the crimes for which he was convicted and sentenced. See *Jackson v. Virginia*, 443 U. S. at 319.

2. Ottley next argues that he received ineffective assistance of counsel because his trial counsel failed to properly prepare for trial or to adequately test the expert medical evidence presented by Cooley and Dr. Mansfield on behalf of the State. He

7

notes that his trial counsel failed to interview either of these witnesses before trial, asked only two questions of Dr. Mansfield on cross-examination, and failed to cross-examine Cooley at all.

> In order to prevail on this claim, [Ottley] must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. To meet the first prong of the required test, he must overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case. To meet the second prong of the test, he must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.

(Citations and punctuation omitted.) *Norton v. State*, 293 Ga. 332, 337 (7) (745 SE2d 630) (2013).

At the hearing on the motion for new trial, Ottley's trial attorney testified that he had been practicing law for 40 years and had tried hundreds of jury trials,

8

including criminal trials. He said that he had won more cases than any other lawyer in Columbus.

Ottley's counsel was retained on December 14, 2009, approximately five months before trial, and he and his associate spent hours working on the case. Thus, he felt like he was "really prepared to go to trial." Part of counsel's trial strategy was to point to the fact that the victim did not raise the allegation of sexual abuse until several months after Ottley had separated from her mother and only when the Ottleys were engaged in an ongoing divorce with large amounts of money at stake. Counsel and his associate planned to present testimony about the family situation and the grandmother's unusually strong influence in the household. Additionally, they planned to rely on the fact that the child's hymen was completely intact, which counsel believed "indicated that the child never had sex." Accordingly, their trial strategy was to challenge the victim's story by introducing evidence to show "why the little girl would have fabricated this story and that it couldn't have happened." But he did not plan to challenge the State's medical evidence because he thought it was good for the defense.

Ottley's counsel stated that no one in his office investigated Cooley's credentials or interviewed her before trial because he did not think that her testimony

"was going to be of any significance," as she had examined the child four months after the Last Incident. He had no idea when he received Cooley's report "that a nurse was going to be allowed to testify like a doctor and give opinions that a child had been molested." He said she testified about the victim's hymen being torn and scarred but she left that out of her report. He explained, "So we went to trial rel[ying] on the written report she gave[;] then we get to trial and she starts talking about all the scarring and tearing and that this child's sexual organ looked like that of a [30-year-old] woman and all this stuff[,] and it was just kind of a surprise."

But when questioned on the contents of Cooley's report, counsel admitted that he overlooked a reference in the report that the victim's "posterior labia majora [was] stretched and flaccid for [a] 12 year old, looks more like a [30-year-old] woman that has had children." He also testified that he was completely unfamiliar with the SANE program under which Cooley was trained.

When Cooley ended up being the "main witness" at trial, he was caught off-guard. Although he objected, sometimes successfully, to some of the evidence Cooley was asked to present, including certain charts, he did not ask her a single question at trial because he and the attorney working with him were "[t]otally unprepared to

cross-examine her," and it was "too late at that point." Ottley's counsel stated, "I couldn't wait for the lady to get off the stand."

The attorney also said that he did not interview Dr. Mansfield either because he felt his testimony would help the defense as his report indicated that the victim's hymen was intact. He also admitted that he did not do any medical research before trial because he did not see the need for it given Dr. Mansfield's finding in this regard.

In addition to his trial counsel's testimony, Ottley also submitted two affidavits in support of his motion for new trial, one from Dr. Mansfield and another from Dr. William B. Simpson. Dr. Mansfield's affidavit stated that he was not interviewed by anyone from Ottley's trial counsel's office prior to trial. But, had he been asked during his trial testimony, he would have testified that "a hymen can have a slight tear or be broken by any blunt force trauma including masturbation" and that "[an] asymmetrical labia can be [a] congenital condition."

Dr. Simpson stated in his affidavit that he is a duly licensed physician in the State of Georgia with a board certification in Obstetrics and Gynecology. During his career, he has performed over 15,000 gynecological exams. Dr. Simpson, who stated that he was not compensated for his opinion, said that he had reviewed the testimony

11

of Cooley and Dr. Mansfield, as well as Cooley's report and the photographs admitted at trial of the victim's genital area, but he did not examine the victim herself. Although he acknowledged that his opinion was limited by the resolution of the photo copies, he opined that the victim's hymen was intact and that he saw no evidence of "an opening being repeatedly penetrated by an adult penis." He further stated that "[t]he size of a labia and/or the associated folds medically is of no medical significance" and "varies from person to [] person and is congenital."

We find that Ottley has carried his burden of establishing that his trial counsel's performance was deficient. The evidence in support of the charges in this case included the victim's own testimony and her prior statements, evidence from those around her regarding changes in her behavior, and the medical evidence. Ottley's counsel's trial strategy was to attack the child's and her family's credibility and to accept the State's medical evidence. Even viewing the situation from counsel's perspective at the time, we cannot say that this strategy was reasonable under the circumstances or that the decision to pursue such a strategy was made in the exercise of reasonable professional judgment.

It is evident from Ottley's counsel's testimony at the motion hearing that he was dismissive of Cooley's role at trial because she was a nurse and "not a doctor."

12

Prior to trial, however, counsel had Cooley's report, in which she identified herself as both a registered nurse and a nurse practitioner. These designations should have put counsel on notice that Cooley may have had training and education that would have qualified her to provide expert testimony.

In fact, Cooley's report demonstrated that she had not only found an abnormality (the "30-year-old woman" finding) during her examination of the victim, but she also had drawn the conclusion that this abnormality indicated chronic, "blunt penetrating trauma of the vaginal orifice." Under the section of the report allowing Cooley to summarize her findings, she wrote:

> Specific location of finding consistent with history of blunt penetrating trauma of the vaginal orifice. No other history of accident to cause this trauma. Due to history and examination being chronic instead of acute injury. Wrinkle wound describes a situation wherein a sweeping motion of an object contacting skin in more than one location in a sequence as it passes by.

This information, which Ottley's attorneys apparently also overlooked, should have put them on inquiry notice as to whether Cooley's training and experience may have qualified her to render expert medical testimony regarding the condition of the victim's genital area and the cause for any abnormalities.

13

"[T]he law in Georgia does not require that only medical doctors be permitted to give testimony regarding a medical issue, but allows others with certain training and experience to testify on issues within the scope of their expertise." *Hyde v. State*, 189 Ga. App. 727, 728 (1) (377 SE2d 187) (1988). Accordingly, it is well settled in this State that

> [a] licensed registered nurse is qualified to testify as an expert witness within the areas of her expertise. A witness with such skill, knowledge or experience in a field or calling as to be able to draw an inference that could not be drawn by the average layman may be qualified as an expert witness.

(Citation and punctuation omitted.) *Rodriguez v. State*, 281 Ga. App. 129, 131 (2) (635 SE2d 402) (2006) (upholding trial court's decision to allow into evidence nurse's opinion that the victim's injuries were consistent with ones caused by penetration by a finger based on her education and SANE training). See also *Avret v. McCormick*, 246 Ga. 401 (271 SE2d 832) (1980) ("Medical experts are persons possessing technical and peculiar knowledge, and any person learned in medical or physiological matters[, including a nurse,] is qualified to testify as an expert thereon, even though he is not a medical practitioner.") (citation omitted); *Hyde*, 189 Ga. App. at 728 (1) (upholding admission of nurse's testimony about vaginal and hymenal

14

scarring based on her training and education). Thus, we find that Ottley's counsel's assumption that Cooley would never be allowed to give expert medical testimony was not reasonable given the information available to him prior to trial and well-settled principles of Georgia law.

"In assessing trial counsel's performance, we must be mindful that counsel's function is to make the adversarial testing process work in the particular case." (Citation and punctuation omitted.) *Goldstein v. State*, 283 Ga. App. 1, 8 (3) (b) (640 SE2d 599) (2006). And "[c]ounsel has a duty to make reasonable investigations." (Citation and punctuation omitted.) *Jowers v. State*, 260 Ga. 459, 462 (2) (396 SE2d 891) (1990). Under the peculiar circumstances of this case, we find that Ottley's trial counsel's failure to investigate Cooley's credentials, to interview either Dr. Mansfield or Cooley prior to trial, or to research the medical issues rendered his performance outside the wide range of reasonable professional conduct. In particular, we find it troubling that the defense strategy was to show that the victim fabricated her testimony, yet counsel failed to investigate Cooley's findings in the report that the victim suffered from trauma in her genital area or Dr. Mansfield's potential testimony – together the only testimony on the physical evidence to be presented by the State supporting the allegations. Nor did counsel consult or call any medical expert to

15

support the defense theory that the incidents could not have happened because the hymen was intact.

Moreover, Ottley's trial counsel failed to test the medical witnesses's testimony at trial in any way. He did not cross-examine Cooley at all and asked Dr. Mansfield only two questions simply to ascertain whether the victim's hymen was intact. His only explanation for failing to question Cooley was his failure to prepare for such cross-examination. We have found that Ottley's counsel should have investigated the substance of the testimony Cooley would offer at trial, and Ottley has demonstrated that testimony was available from other credible, objective sources to counter Cooley's expert opinions. In fact, Dr. Mansfield himself would have contradicted Cooley's conclusion that the condition of the victim's hymen could not be attributable to other factors such as masturbation. And that testimony would have provided an alternative to Dr. Mansfield's own direct testimony that the scarring was consistent with sexual abuse. Moreover, both Dr. Mansfield and Dr. Simpson would have testified that the condition of the victim's labia could have been congenital in origin.

But because Ottley's counsel failed to cross-examine Dr. Mansfield or to present any other medical evidence, "the jury was left with the impression that the opinions of the State's expert witnesses were unassailable. We must agree that this

16

omission fell below the standard of acceptable professional conduct." *Goldstein*, 283 Ga. App. at 8 (3) (b). See also *Darst v. State*, ___ Ga. App. __ (2) (a) (ii) (746 SE2d 865) (2013) (physical precedent only) (counsel's failure to present expert testimony regarding the behavioral patterns of sexually abused children constituted deficient assistance of counsel).

We find that "trial counsel's failure to investigate the medical issues and seek and present testimony to rebut that presented by the State was a crucial omission. The State's evidence, other than opinions from their experts, was far from overwhelming." *Goldstein*, 283 Ga. App. at 8-9 (3) (b). Although the victim testified as to Ottley's actions, her testimony and prior statements were at times inconsistent and self-contradictory. Moreover, she made her outcry in May 2010, only after the Ottleys had separated and begun a contested divorce. And although the family testified as to changes in her behavior at the pertinent time, her mother provided an alternate reason for such behavioral changes as she testified that she attributed the changes to the victim's ADHD, for which the vicitm was prescribed various medications. Additionally, the jury may have considered the victim's stepmother's discovery of the then 12-year-old victim masturbating in a different light if Ottley's counsel had

17

presented evidence showing that such activity could have resulted in the scarring that Cooley described.

Thus, because the medical evidence was crucial in establishing that sexual abuse had occurred, Ottley's counsel's failure to take any action to counter that evidence was extremely detrimental to the defense. "Trial counsel simply did not make the adversarial testing process work. Adjudged under the foregoing criteria, we hold that the omitted evidence in this case is of sufficient probative value to require a new trial."(Citations and punctuation omitted.) *Goldstein*, 283 Ga. App. at 9 (3) (b) (finding counsel ineffective in child abuse case in failing to test or present evidence in response to the State's expert medical evidence). See also *Jowers v. State*, 260 Ga. at 462 (2) (finding trial counsel rendered ineffective assistance of counsel where attorney failed to adequately investigate the case and failed to utilize the contents of the GBI reports that would have supported the defense).

Thus, "although [Ottley's] trial counsel was experienced and generally able, his assistance in this trial was ineffective." *Goldstein*, 283 Ga. App. at 1. Because he failed to present evidence to counter what he should have known would be important medical evidence in the case, a reasonable probability exists that, absent counsel's

professional error, the result of the trial would have been different. Accordingly, we conclude that Ottley is entitled to a new trial.

*Judgment reversed. Andrews, P. J., and Dillard, J., concur.*