S05A2064. TERRY v. JENKINS.
(627 SE2d 7)

HUNSTEIN, Presiding Justice.

In September 1995, Larry L. Jenkins, Jr., was convicted of the malice murders of Terry and Michael Ralston and related crimes. He was sentenced to death for each of the murders, and this Court affirmed. *Jenkins v. State*, 269 Ga. 282 (498 SE2d 502) (1998). Jenkins filed a petition for writ of habeas corpus on March 4, 1999. After conducting evidentiary hearings in December 2002 and January 2003, the habeas court vacated Jenkins's death sentences and convictions, finding, inter alia, that the Supreme Court of the United States had declared death sentences for crimes committed by persons under the age of 18 to be unconstitutional and that Jenkins's trial counsel rendered ineffective assistance in the guilt/innocence phase of Jenkins's trial. For the reasons set forth below, we affirm the judgment of the habeas court ordering a new trial.

1. The habeas court found as a matter of fact that Jenkins was 17 years old at the time of the crimes of which he was convicted and vacated Jenkins's death sentences in light of the recent holding of the Supreme Court of the United States that death sentences for crimes committed by persons under the age of 18 violate the Constitution of the United States. *Roper v. Simmons*, 543 U. S. 551, 568 (125 SC 1183, 161 LE2d 1) (2005) ("A majority of States have rejected the imposition of the death penalty on juvenile offenders under 18, and we now hold this is required by the Eighth Amendment."). The Warden has not appealed the ruling vacating Jenkins's death sentences, and pursuant to *Roper*, supra, Jenkins is no longer subject to those sentences.

2. In his petition for habeas corpus, Jenkins challenged the sufficiency of his attorneys' performance in the guilt/innocence phase of his trial, arguing that counsel failed to conduct a reasonable investigation into the crimes and possible defenses. We agree with

the habeas court's conclusion that counsel rendered ineffective assistance in the guilt/innocence phase of trial and affirm that portion of the habeas court's order.

An ineffective assistance claim requires a showing that counsel performed deficiently under constitutional standards and that counsel's deficiency in reasonable probability changed the outcome of the case. *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis*, 253 Ga. 782, 783-784 (1) (325 SE2d 362) (1985). In weighing the adequacy of counsel's performance, counsel is presumed to have provided "reasonable professional assistance." Circumstances knowable only through hindsight are not considered. *Strickland*, 466 U. S. at 689-690 (III) (A). As an appellate court, "we accept the habeas court's findings of fact unless clearly erroneous but independently apply those facts to the law." *Head v. Ferrell*, 274 Ga. 399, 404 (V) (554 SE2d 155) (2001).

(a) Evidence introduced during the guilt/innocence phase of Jenkins's trial focused largely on questions regarding who was at various places at various times relative to the place and time of the murders. The evidence demonstrated that on the night of the crimes the victims were abducted from a coin-operated laundry and the victims and a large quantity of quarters were taken away in the victims' white van. The victims' bodies were later discovered face down in a ditch near some railroad tracks.

The general time of the murders was well established. Terry Ralston's father testified that she normally closed the laundry at about 9:00 p.m. and various witnesses testified that on the night of the crimes they heard multiple gunshots about 9:00 p.m. and saw an unoccupied white van near the area where the bodies were found sometime between 9:00 and 10:00 p.m.

David Wilkerson, a friend of Jenkins, testified that Jenkins came to visit him at the Kentucky Fried Chicken restaurant where he worked at about 10:00 or 10:30 p.m. Another employee, Nekia Wilson, testified that Jenkins arrived at the restaurant at about 10:30 p.m. in a white van. She did not testify as to whether Jenkins arrived alone. Wilkerson, who was granted use and derivative use immunity, recounted that Jenkins returned to the restaurant at 11:30 or 11:45 p.m. in the white van, which Jenkins claimed belonged to his mother, and they drove to the Briarwood apartment complex to allow Wilkerson to change his clothes. Jenkins and another individual, Burnies Durden, then picked up Wilkerson and the three set out for the night in the white van. Wilkerson testified that he saw Jenkins with a handgun and saw a bag of quarters; however, he conceded on cross-examination that he did not see the handgun or the quarters until Durden joined the group. Wilkerson further testified that on the day following the crimes he, Jenkins, Durden, and a young man named

Jeramon Campbell rolled the quarters and attempted to trade them for cash. Wilkerson testified that Jenkins never stated that he had committed a crime.

Jeramon Campbell, who also was granted use and derivative use immunity, testified that he was at his sister's apartment at the Briarwood apartment complex when he noticed Durden, Wilkerson, and Jenkins in the parking lot with a white van, which Jenkins said was his mother's. Campbell joined the group and assisted them in rolling quarters. Campbell testified that he saw Jenkins with Michael Ralston's driver's permit, but he denied that Jenkins made any comment about the license. Durden allegedly told Campbell that "they had killed a lady," but Campbell was emphatic under questioning by the prosecutor that Jenkins did not report being involved in a murder and that only Durden stated that "they" had committed a murder. Campbell stated that he confronted Jenkins with Durden's claim about a murder, to which Jenkins replied, "We were just kidding."

Burnies Durden, testifying under use and derivative use immunity, gave the most damning testimony at Jenkins's trial. Durden testified that he was at the Briarwood apartment complex playing cards with friends when Jenkins and Wilkerson arrived in the white van at about 11:30 p.m. Durden testified that Jenkins had a handgun, that Jenkins claimed that the van was his mother's, and that Jenkins had quarters he said came "[o]ut of a piggy bank." Durden testified that Jenkins privately stated that he killed and robbed someone. Directly contrary to Campbell's testimony, Durden testified that Jenkins insisted to Campbell that he committed a murder and that Jenkins even presented the driver's permit to Campbell as evidence, saying, "If you don't believe what I did, here's the license to prove it."

Throughout trial, Jenkins's trial counsel attempted to show that other persons used the victims' white van on the night of the murders or should be suspected for other reasons, focusing special attention on Durden and a man named Michael Woods. Counsel emphasized Campbell's testimony that it was Durden who stated "they" had committed a murder and that Jenkins denied committing a crime. Counsel also presented testimony tending to establish that on the night of the murders Durden visited a second apartment complex alone and in a white van and that one white woman and multiple black males were driving in the white van between 8:00 and 9:00 p.m. One witness testified that Jenkins, Wilkerson, and Durden visited her apartment in the early morning hours following the murders and Durden threw away a pair of black boots in her apartment dumpster. She later inspected the boots and found that they had material on them that appeared to be blood. Counsel attempted several times to create reasonable doubt by suggesting that Michael Woods was

involved in the murders, but their questioning was ineffectual apart from being able to elicit testimony from an investigator that Woods had been a suspect and his whereabouts at the time of the murder were unknown.

(b) The whole of this disputed evidence demonstrates that Jenkins's main defense during the guilt/innocence phase was to create reasonable doubt by showing that the crimes were committed by others, namely, Durden and Woods. With regard to counsel's actions in investigating and establishing this defense, the record from the habeas hearing shows that after Jenkins's arrest, a local attorney, Kenneth Carswell, was appointed to represent Jenkins. Because Carswell lacked experience in death penalty cases, the trial court appointed G. Terry Jackson to serve as lead counsel, and Carswell became co-counsel. The habeas court found that "Jackson and Carswell miscommunicated about the role each would play in [Jenkins's] defense." Our review of the record confirms this finding. Jackson testified in a deposition that it was Carswell's job "to investigate all of the witnesses and events in Jesup." In contrast, Carswell saw his job as "doing what I was told, providing some 'local flavor,' and telling Terry what I knew about local witnesses, such as Michael Woods, Burnies Durden, Jeramon Campbell, David Wilkerson, and so on." Carswell further testified that even though he was appointed as counsel for Jenkins in this death penalty prosecution, he was not going to "fan the flames." When he was asked to clarify this statement he stated, "I just was not going to be front and center on it. . . . If witnesses were brought to me, I'd talk to them. I was not personally going to run down every rumor I heard."

Jackson's lack of knowledge of Carswell's inactivity and his lack of oversight of the preparation of the case are reflected in his testimony admitting that it was not until trial that he discovered that "very, very little had been done" to prepare mitigating evidence. Jackson testified that part of his strategy in Jenkins's case was to cast suspicion on Michael Woods but that he lacked evidence to support that theory. Evidence introduced at the habeas hearing established, however, that a defense investigator learned that Jenkins's family members suspected he had been coerced by Woods into taking the blame for the murders, and Carswell had learned of rumors to that same effect. In fact, Jackson's files contained a note indicating that a woman by the name of LaSandra Gibbs may have had some information about a "threat," but Jackson could not recall if the matter had been investigated at the time of trial and no evidence of a threat was introduced at trial.

Carswell testified in the habeas hearing and by affidavit that, at the time leading up to trial, both he and Jackson believed Woods was involved in and may have been directly responsible for the murders.

The habeas court found, and our review of the record and transcripts supports the finding, that counsel's only investigation into Woods's activities consisted of a short interview by Carswell, who stated that he obtained no useful information and abandoned any further inquiry into Woods's possible involvement after hearing unconfirmed reports that Woods had provided an alibi and rumors that he had taken and passed a polygraph examination.

With regard to Woods's alibi, which was that at the time of the murders he was in a neighboring town visiting his wife and mother-in-law, Deborah Crayton and Louise Quick, the habeas court specifically found that Carswell failed to perform even the most rudimentary investigation and that Carswell's investigation into Woods's involvement in the crimes was so deficient that it actually "impeded the investigation of [Jenkins's] case." The record supports the habeas court's findings in that counsel failed to investigate and confirm something so fundamental to Jenkins's defense as the alibi of the individual both police and trial counsel believed may have been the perpetrator of the crimes.[1] Moreover, Jackson testified that six days before trial Jenkins told him that on the night of the murders he was with Woods, who prevented him from leaving, and that Woods and Durden committed the crimes and then threatened to harm Jenkins's family if he spoke up. Jackson testified, however, that they did nothing to investigate Woods's involvement in the crimes because of the impending trial. There also is no evidence that counsel made any effort to request a continuance in order to investigate Jenkins's claim.

Had defense counsel investigated its own primary defense, they would have discovered that both Crayton and Quick denied that Woods was with them on the night of the murders, as well as the testimony of numerous other witnesses who would have testified that Woods and a number of other persons had been seen using the victims' white van near the time of the crimes. Although Jackson testified that he recalled being aware of at least one report that Woods was seen with the white van the morning after the murders, he testified without explanation that no further investigation was conducted and that no evidence of Woods's control of the van the day after the murders was presented to the jury for its consideration. Habeas counsel, in contrast, presented four witnesses whose testimony demonstrated Woods's possession and control of the van and that Woods told one such witness that the van was his.

---

[1] Despite learning that Woods may have taken and passed a polygraph test, counsel also failed to inquire about the examination and at no time requested permission to review the results of the polygraph test.

Counsel also had in their possession reference to a witness, LaSandra Gillard, who was willing to testify that Woods had "a bunch of quarters" and "kept looking out the window" on the night of the murders. Gillard's sister, LaTanya Hardy, testified that she observed Woods exiting the driver's door of the white van just before 10:00 p.m. and that Woods gave her 10 or 11 dollars in quarters to play poker. Sadaetris Goss and Quansetrina Ravenell both testified that they observed Woods exiting the driver's side of the white van shortly before 10:00 p.m. and that they observed Woods giving quarters to LaTanya Hardy. Terry Moore testified that he saw Woods exiting the driver's side of the white van shortly before 10:00 p.m. Moore, Charlotte Quimbley, and Barbara Hernandez all testified that they observed Durden exiting the passenger side of the van close to 10:00 p.m. None of these witnesses were contacted by the defense despite the fact that they were known to counsel or were easily discoverable by counsel. Elizabeth James, the one witness who had been contacted by the defense, testified that she observed Durden shortly after 10:00 p.m. in her apartment, that Durden "had this look of fear on his face" and "had stains on his clothes that looked like blood," that Woods was in a nearby apartment acting strange and looking out the window, and that the defense investigator asked only superficial questions about her knowledge of the case. In short, where trial counsel failed to do so, habeas counsel obtained testimony from numerous witnesses tending to establish that Woods lied to police about his whereabouts on the night of the crimes, that he was driving the victims' white van shortly after the murders and handing out quarters, that Durden was riding with Woods wearing clothing stained with something that looked like blood, and that both Woods and Durden were acting strangely on the night of the murders.

(c) As noted above, an ineffective assistance claim is comprised of two separate showings, that counsel performed deficiently under constitutional standards and that those deficiencies in reasonable probability led to a different outcome of the case. With specific regard to a challenge of defense counsel's investigation of a case, the United States Supreme Court recently reaffirmed the principles of *Strickland*, stating:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

(Citations and punctuation omitted.) *Wiggins v. Smith*, 539 U. S. 510, 521-522 (II) (A) (123 SC 2527, 156 LE2d 471) (2003). See *Martin v. Barrett*, 279 Ga. 593 (619 SE2d 656) (2005). Counsel's failure to investigate is unreasonable where, as the habeas court found in this case, it resulted from inattention and not from reasoned strategic judgment. *Wiggins*, supra at 526 (II) (B) (1), 534 (II) (B) (3).

The record and transcripts in this appeal support the habeas court's findings describing the careless and unreasonable manner in which defense preparations were undertaken and juxtapose the evidence presented at trial with the evidence that trial counsel failed to discover. As determined by the habeas court, "this is not a case where, after investigation, counsel for the defendant decided to pursue one strategy rather than another" but a case where counsel's "investigation into their own theory of the case was entirely inadequate." In light of the record evidence, we agree with the habeas court's conclusion that trial counsel rendered deficient performance by failing to investigate the factual defense to the crime and failing to obtain available testimony confirming that defense and their client's own statements to them. Furthermore, counsel's decision to end the investigation into Woods's involvement when they did was neither consistent with professional standards nor reasonable in light of the evidence obtained by habeas counsel, evidence that would have caused reasonably competent counsel to investigate further.

Having determined that trial counsel rendered constitutionally deficient performance, we must consider the prejudice Jenkins suffered as a result of counsel's deficient performance. As the above discussion indicates, and as our review of the remaining evidence presented at trial confirms, there was reason for very strong suspicion to rest on Jenkins in the minds of the jurors. Had trial counsel performed adequately and presented the available evidence that habeas counsel has brought to light, reasonable jurors still may have concluded beyond a reasonable doubt that Jenkins was not only present during the murders but was either the actual perpetrator of the crimes or an accomplice thereto. As recently emphasized by this Court, however, the burden in an ineffective assistance claim "is to show only 'a reasonable probability' of a different outcome, not that a different outcome would have been certain or even 'more likely than not.' [Cit.]" *Schofield v. Gulley*, 279 Ga. 413, 416 (I) (A) (614 SE2d 740) (2005). Whatever our own opinions may be about the verdict in this case, we conclude, in agreement with the habeas court, that there is

a reasonable probability that the jury would have reached a different verdict in the guilt/innocence phase of trial if confronted with the evidence presented by habeas counsel that trial counsel failed to obtain.

3. Because we conclude that counsel's deficiencies so prejudiced Jenkins as to require a new trial, we need not address the Warden's contention that the habeas court erred in finding Jenkins's counsel ineffective in investigating and presenting mental retardation evidence in the guilt/innocence and sentencing phases or by operating under a conflict of interest. We also need not address the Warden's claim that the habeas court erred by finding that the prosecution improperly suppressed material evidence.

*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 27, 2006 —
RECONSIDERATION DENIED MARCH 27, 2006.

*Stephen D. Kelley, District Attorney, Thurbert E. Baker, Attorney General, Christopher D. Helms, Assistant Attorney General, for appellant.*

*Davis, Polk & Wardwell, Hayward H. Smith, Ogden N. Lewis, Andrew Dean, Thomas H. Dunn, for appellee.*