**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and BRANCH, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

July 16, 2013

# In the Court of Appeals of Georgia

A13A0645. DARST v. THE STATE.

ELLINGTON, Presiding Judge.

A Gwinnett County jury found Roger Darst guilty beyond a reasonable doubt of four counts of aggravated child molestation, OCGA § 16-6-4 (c). He appeals from the denial of his motion for new trial, contending that his trial counsel provided ineffective assistance by failing to obtain certain records concerning the victims, present expert witness testimony, and object to certain testimony. He also contends that the trial court erred in failing to dismiss four jurors for cause. For the following reasons, we conclude that, although the evidence was sufficient to support Darst's convictions, he received ineffective assistance of counsel and, as a result, the trial court erred in denying his motion for new trial. Therefore, we reverse his convictions and remand this case to the trial court for a new trial.

1. Viewed in favor of the jury's verdict,[1] the trial transcript shows the following relevant facts. In February 2002, Darst and his girlfriend, Sasha Binzel, became the foster parents of two girls, twenty-month-old S. C. and four-year-old C. C. Although the children had been removed from their biological parents' home due to neglect, the children's mother (who was separated from their father) continued to work with the Georgia Department of Family and Children Services ("Department") to regain custody of the girls. In addition, the children's paternal grandparents, who lived in Pennsylvania, began participating in juvenile court custody proceedings in Georgia and working on the requirements to obtain permanent custody of the girls. Pursuant to those proceedings, the juvenile court allowed the grandparents to have visitation with the girls for a few weeks in the summers of 2003 and 2004, during which time the children's biological father, who lived nearby, was allowed to have supervised visitation with the girls. In September 2004, the juvenile court granted the grandparents' petition for permanent custody of the children, and the girls were told that they were going to be moving to Pennsylvania in the next few months.[2]

---

[1] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[2] The children moved to Pennsylvania in January 2005.

In October 2004, when S. C. was four years old, the child told Binzel that Darst had been playing the "private game" with her, that he had touched her "private part" with his hand, that he had forced her to put her mouth on his "private part" and told her to suck it, and that his "private part" was "sticking out." According to S. C., Darst had warned her not to tell anyone or he would do "something bad." Although Binzel told Darst about S. C.'s outcry shortly after the child made the statements, she did not report the outcry to law enforcement officials. Instead, Binzel called a therapist who had been treating the older child, C. C., and told her about S. C.'s outcry. Although the therapist did not testify at trial,[3] another witness testified that S. C. told the therapist that both Darst and her "Uncle Billy" had had sexual contact with her. The therapist reported the outcry to the Department, and the Department arranged for a psycho-sexual evaluation to be conducted on S. C.[4] As a result of S. C.'s statements to the therapist and her psycho-sexual evaluation, Binzel was told that she should not

---

[3] See Division 2, infra, regarding the therapist's testimony during the motion for new trial hearing, as well as testimony by an expert witness on her opinion about the therapist's actions in this case.

[4] The person who conducted the psycho-sexual evaluation did not testify at trial.

allow Darst to be alone with S. C. Despite this instruction, Binzel continued to leave C. C. alone with Darst.

On Saturday, November 13, about a month after S. C.'s outcry to Binzel, seven-year-old C. C. told Binzel that Darst had touched her "private," that he had forced her to put her hands and mouth on his "private," and that he had showed her a magazine.[5] According to C. C., she did not know about S. C.'s allegations against Darst when she (C. C.) made her outcry to Binzel, and Binzel testified that she had not told C. C. about S. C.'s earlier statements about Darst. Just as she had done after S. C.'s outcry, Binzel told Darst about the allegations and scheduled an appointment for C. C. with the child's therapist for the following Monday, but she did not call the police or the Department. Instead, over the next two days, Binzel repeatedly questioned C. C. about the allegations. At trial, Binzel admitted that, in an attempt to "scare [C. C.] so she would tell the truth," she told the child that the police might make her do a polygraph test to see if she is lying and that they might take her to a doctor and make her take her clothes off so they could look at her and check for fingerprints, telling her that fingerprints never go away. Further, during the investigation that followed

_____

[5] At trial, C. C. also testified that Darst sometimes slapped and yelled at her, particularly when Binzel was not present.

C. C.'s outcry, Binzel admitted that, in addition to these statements, she told C. C. that she should not trust the police, that the police were going to be mean to her and take her away, that the police were going to do exams on her that would hurt, and that the police were going to "fingerprint her vagina." Despite the intense questioning by Binzel, however, C. C. did not recant her statements or tell Binzel that anyone else had molested her.

On Monday and Tuesday, November 15 and 16, Binzel took C. C. to the therapist. The next day, the therapist reported C. C.'s outcry to the Department's case manager, who then contacted the special victims unit of the Gwinnett County Police Department. The case manager took the children to the Gwinnett County police station, where a police investigator attempted to question the children about their outcries. S. C., however, refused to talk to the investigator about anything but unrelated, "fun" topics. Similarly, C. C. refused to talk about her allegations other than to say that Darst had done something "bad" to her. As a result of the children's reluctance to talk to the police investigator, and in an effort to help the children feel more comfortable talking with the police, the investigator asked a female detective to interview the children, but the children did not disclose anything to her, either.

In December, forensic interviews were conducted with both children at the Children's Healthcare of Atlanta's Child Protection Center.[6] Because S. C. was unwilling to go into the interview room alone, the Department case manager stayed in the room throughout the interview. During that interview, S. C. reported that Darst had "tasted" her genital area with his mouth and had forced her to "lick" his penis. Similarly, during her forensic interview, C. C. reported that Darst had touched her "private" with his hand and mouth and had forced her to touch his "private" with her hand and mouth. The interviewer asked both children if anyone had ever touched them like that other than Darst, and both girls said no. The recordings of the interviews were admitted into evidence at trial without objection, and the State played the recordings for the jury.

---

[6] The forensic interviewer's expert qualifications included obtaining Bachelor's and Master's degrees in Social Work; attending several week-long training sessions in forensic interviewing; conducting approximately 525 forensic interviews during her career; having been repeatedly qualified as an expert in forensic interviewing by courts; and serving as a supervisor of new forensic interviewers. The interviewer testified that, during such interviews, she often uses anatomical drawings to allow a child to name various body parts using his or her own terms and, if a child reports any inappropriate contact, to give him or her a chance to point to the body parts that were touched. She also uses anatomically correct dolls for demonstration purposes if a child has reported some inappropriate sexual contact but has difficulty describing what happened to them.

As a result of the children's allegations, the State charged Darst with committing two counts of aggravated child molestation[7] against C. C., with one count alleging that he placed his mouth on her vagina and the other alleging that he put his penis in her mouth. The State also charged him with committing the same offenses against S. C.

At trial, Darst, Binzel, and four character witnesses testified for the defense. Darst denied the allegations, and his defense was focused on attacking the children's credibility by showing the jury that their outcries to Binzel, their interview statements, and their trial testimony were inconsistent and unbelievable. His counsel suggested that, if the children had been molested, it was by someone else, such as their biological father or their "Uncle Billy."

We conclude that the evidence presented at trial was sufficient to authorize the jury to find Darst guilty beyond a reasonable doubt of each count of aggravated child

---

[7] Under the relevant portion of OCGA § 16-6-4 (c), a person commits the offense of aggravated child molestation when he or she commits an act of child molestation that involves an act of sodomy. See OCGA § 16-6-4 (a) (1) ("A person commits the offense of child molestation when such person . . . [d]oes any immoral or indecent act to or in the presence of or with any child under the age of 16 years with the intent to arouse or satisfy the sexual desires of either the child or the person[.]").

7

molestation as charged in the indictment.[8] See *Beaudoin v. State*, 311 Ga. App. 91, 92 (1) (714 SE2d 624) (2011); *Gentry v. State*, 213 Ga. App. 24, 24-25 (1) (443 SE2d 667) (1994).[9]

2. In several related claims of error, Darst contends that his trial counsel provided ineffective assistance and that the trial court erred in finding otherwise. Specifically, Darst argues that his counsel was ineffective when he failed to obtain and utilize the children's therapy, school, and Department records; failed to consult with or present the testimony of experts on the issue of how to conduct reliable

---

[8] "Because due process requires the existence of sufficient evidence as to every element of the crime of which a defendant is convicted, *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979), the fact that this issue was not explicitly raised does not prevent us from addressing (nor, more importantly, does it justify a refusal to address) the issue at this juncture." (Citations omitted.) *Garza v. State*, 284 Ga. 696, 704 (3), n. 7 (670 SE2d 73) (2008).

We note that erroneously-admitted hearsay, which is "wholly without probative value and [has] no weight in establishing the facts necessary to convict the defendant," has not been considered in reviewing the sufficiency of the evidence in this case. (Citations and punctuation omitted.) *Livingston v. State*, 268 Ga. 205, 209 (1) (486 SE2d 845) (1997). See Division 2 (a) (iv), infra, regarding inadmissible hearsay evidence in this case.

[9] See also *Smith v. State*, 291 Ga. App. 389, 390 (1) (662 SE2d 201) (2008) ("[C]orroboration of a child molestation victim's testimony is not required under Georgia law[.]") (footnote omitted); *Cook v. State*, 276 Ga. App. 803, 804-805 (1) 625 SE2d 83) (2005) ("The testimony of the victim and those to whom she reported [the defendant's] actions constituted sufficient evidence to sustain [his] conviction of child molestation[.]") (citations omitted).

forensic interviews and the behavioral patterns of abused children as witnesses; and failed to object or move for a mistrial when certain witnesses repeated hearsay that seriously undermined his defense strategy.

In order to establish a claim of ineffective assistance of counsel, a criminal defendant must address the two-pronged test enunciated by the Supreme Court of the United States in *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). *Robinson v. State*, 277 Ga. 75, 75-76 (586 SE2d 313) (2003). First, the defendant must show that counsel's performance was deficient, overcoming the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct. Id. Second, the defendant must show that the deficient performance so prejudiced him or her that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different.[10] Id.; see *Terry v. Jenkins*, 280 Ga. 341, 347 (2) (c) (627 SE2d 7) (2006) ("[T]he burden in an ineffective assistance claim is to show only 'a reasonable probability' of a different

---

[10] If a defendant fails to satisfy either prong of the test, he will be unable to prevail on his ineffective assistance claim, so the court is not required to consider the remaining prong. *Covington v. State*, 251 Ga. App. 849, 852 (2) (555 SE2d 204) (2001).

outcome, not that a different outcome would have been certain or even 'more likely than not.'") (citation omitted).

When a defendant establishes that trial counsel's performance was deficient in more than one respect, the court's determination of whether he or she was prejudiced thereby requires consideration of the "collective effect of the deficiencies." (Citation omitted.) *State v. Worsley*, __ Ga. __, __ (3) (Case No. S13A0132, decided July 1, 2013). See *Perkins v. Hall*, 288 Ga. 810, 812 (II) (708 SE2d 335) (2011) (accord); *Robbins v. State*, 290 Ga. App. 323, 329 (4) (659 SE2d 628) (2008) ("[T]he combined effects of counsel's errors should be considered together as one issue with regard to the prejudice test.") (footnote omitted). "[I]t is the prejudice arising from counsel's errors that is constitutionally relevant," so each individual error by counsel should not be "considered in a vacuum." (Citation and punctuation omitted.) *Schofield v. Holsey*, 281 Ga. 809, 812 (II), n. 1 (642 SE2d 56) (2007), citing *Strickland v. Washington*, 466 U. S. at 687 (III).

Finally, when this Court reviews a trial court's ruling on an ineffective assistance claim on appeal, "[w]e accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the

10

legal principles to the facts." (Citation and punctuation omitted.) *Robinson v. State*, 277 Ga. at 76.

(a) *Was trial counsel's performance in this case deficient?*

(i) Darst contends that his trial counsel's failure to obtain the children's school, therapy, and Department records constituted ineffective assistance because those records demonstrate that the children's documented behavior during the time he and Binzel were their foster parents was inconsistent with their allegations of his molestation of them.

The record shows that, on the first day of the three-day hearing on the motion for new trial, Darst's appellate counsel stated that, unlike trial counsel, he had obtained the children's school, therapy, Department, and juvenile court records for the three years they lived in Georgia.[11] According to the Department's records, beginning in April 2002, C. C. reported that her biological father had danced naked in front of her, had slept with her while he was nude, had "made [her] touch him," and had done "secret touching of [her] privates." The Department case manager who supervised the children's care during their first year with Darst and Binzel testified

---

[11] Specifically, appellate counsel obtained 68 pages of school records, 331 pages of therapy records, 232 pages of Department records, and 64 pages of juvenile court records.

11

that C. C. had, in fact, made those statements to her and that she had generated a child protective services report of the allegations. Moreover, the children's therapist testified that, during a session in November 2002, C. C. had said that her biological father had touched her privates and, as a result, the therapist had reported the matter to the Department as required by law. This mandatory report was included in the Department's records.

Further, the Department's records contained numerous reports from its case manager and caseworker, the children's therapist, and other sources that documented the children's positive social, developmental, and educational progress from the fall of 2002 until the fall of 2004, while the children were living with Darst and Binzel, as well as the status of their relationships with Darst and Binzel. The records also showed, however, that the children's behavior and academic performance began to deteriorate in September 2004, shortly after they learned that they would be moving to Pennsylvania to live with their grandparents.

During the hearing on the motion for new trial, trial counsel admitted that he had not obtained a subpoena for any of the records prior to trial, and he offered no strategic reason for failing to do so. Instead, he stated that it was his "understanding"

12

that the Department's records for the children had been lost.[12] Although he later testified that he "was told [the records] were lost," he never identified any person he had contacted or other measures he had taken prior to trial to verify whether the records were, in fact, available. Moreover, trial counsel admitted that he did not know what information was in the Department's records, stating that "[m]aybe it would have been something helpful [to Darst], maybe not." Instead of trying to obtain the records, he decided that he would just "let it go" and try to use the absence of the records to Darst's advantage at trial by arguing to the jurors that the records were just another piece of evidence the State had failed to present that would have helped them better understand the children's background. Further, although trial counsel testified that he made some efforts to contact the children's therapist before trial, he offered no explanation for why he did not attempt to subpoena the children's therapy or school records.

We conclude that Darst has demonstrated that some of the information in the records at issue here was clearly favorable to his defense theory that, if the children

---

[12] Apparently, trial counsel relied on a statement by the police investigator during his interview with Binzel that the Department had "mysteriously" lost the children's records. The investigator did not identify where he had obtained that information.

13

had been molested, it was by someone other than him. Further, as explained below, the records were relevant and necessary to the expert witness' determination that the children's behavior was inconsistent with having been molested by Darst and that other explanations exist for their behavior. Darst has also demonstrated that the records were available pursuant to a subpoena.[13]

---

[13] We acknowledge that the Department's records involving child abuse allegations are deemed confidential under OCGA § 49-5-40 (b). See OCGA § 49-5-40 (a) (3) (B), (C) (The term "child abuse" includes neglect of a child by a parent or caretaker and sexual abuse of a child.). Such records may be obtained, however, by petitioning the trial court to subpoena the records under the provisions of OCGA § 49-5-41 (a) (2), which states that reasonable access of confidential Department records shall be provided to

> [a] court, by subpoena, upon its finding that access to such records may be necessary for determination of an issue before such court; provided, however, that the court shall examine such record in camera, unless the court determines that public disclosure of the information contained therein is necessary for the resolution of an issue then before it and the record is otherwise admissible under the rules of evidence[.]

See *Dunagan v. State*, 255 Ga. App. 309, 311-312 (4) (565 SE2d 526) (2002) (The trial court conducted an in camera inspection of the child's Department file and provided the defendant with several documents from the file concerning earlier child abuse that the court determined might be exculpatory and relevant to his defense.); *Plante v. State*, 203 Ga. App. 33 (416 SE2d 316) (1992) (In a case involving child molestation and sodomy, the defendant caused a subpoena duces tecum to be issued to the Department, calling upon it to produce at trial all records in its possession

14

In contrast, trial counsel has offered no reasonable explanation for his failure to conduct any investigation into the availability or contents of the records in order to make an informed determination of whether the information therein would have been more favorable than harmful to Darst's defense. Nor has he explained his failure to make any effort to obtain the school's or the Department's records. Instead, he has admitted that he decided to forfeit the possibility that the records supported his only defenses at trial for the chance to argue to the jury that the State had failed to present evidence that might have helped the jurors to better understand the children's background.

Under these circumstances, we find that Darst has met his burden of demonstrating that counsel's failure to obtain evidence that was both available and favorable to the defense constituted deficient performance. See *Harris v. Upton*, 292 Ga. 491, 493 (2) (739 SE2d 300) (2013) (noting that counsel's failure to conduct an investigation is unreasonable where it is the result of inattention, rather than reasoned

pertaining to the child. After conducting an in camera inspection of the requested materials, the trial court made four pages of that agency's records available to the defendant.).

We also note that, contrary to the State's assertion, there is no competent evidence in the appellate record that the Department's records were unavailable to trial counsel prior to trial.

15

strategic judgment); *Terry v. Jenkins*, 280 Ga. at 347 (2) (c) (noting that trial counsel's decision to end his investigation was inconsistent with professional standards and patently unreasonable "in light of the evidence obtained by habeas counsel, evidence that would have caused reasonably competent counsel to investigate further.").

(ii) Darst contends that trial counsel was ineffective for failing to consult with and utilize an expert witness who would have been able to show the jury that the children's behavior was inconsistent with having been molested by him.

In perfecting the evidence on this issue during the motion for new trial hearing, appellate counsel first presented the testimony of five lay witnesses, including the children's half-brother, half-sister, step-mother, Binzel's sister, and Darst's daughter, all of whom testified about their observations of the girls' behavior when they were with Darst, particularly the girls' apparent lack of fear of Darst and their consistently enthusiastic and affectionate physical contact with him. According to the witnesses, the children called Darst "daddy," ran to him when he came home from work, seemed excited to see him, liked to be held by him, hugged him and held his hand, jumped on him or sat on his lap, played games with him, and wanted to ride with him in his truck.

One of C. C.'s teachers testified about behavioral, social, and academic problems C. C. was exhibiting when she entered kindergarten in 2002, as well as the generally positive changes she observed in C. C. over the next two years. According to the teacher, however, C. C.'s behavior at school became "very erratic" in September 2004, after the juvenile court awarded custody of the girls to their grandparents. The teacher testified that "it seemed very obvious that the imminent change [in where she would be living] was distressing [to C. C.]"[14]

Appellate counsel subsequently presented the testimony of Dr. Nancy Aldridge,[15] who was qualified by the trial court as an expert in forensic interviewing techniques and in the types of behavior that are typically observed in victims of child molestation, physical abuse, neglect, and/or abandonment. According to Dr. Aldridge, she reviewed the trial transcript, S. C.'s psycho-sexual evaluation, police reports, transcripts and recordings of the children's forensic interviews, the hearing testimony

---

[14] The testimony of the children's therapist echoed these observations.

[15] The record shows that Dr. Aldridge has extensive educational and professional experience in conducting forensic interviews of children who had been physically or sexually abused, educating other professionals in appropriate interviewing techniques, conducting relevant research, and serving as the executive and clinical director of two advocacy centers for physically and sexually abused children for a total of ten years.

of the lay witnesses, and the children's records that had been obtained by appellate counsel.

Dr. Aldridge testified about the typical behavioral patterns observed in children who have been sexually abused, particularly if some force was involved, as in this case. These behaviors include their active avoidance of the perpetrator, expression of their fear of the perpetrator, and serious psychological symptoms, including depression, anxiety, withdrawal from others, and hyper vigilance. In addition, the children often experience a decline in school performance due to their preoccupation with thoughts of the abuse, their inability to concentrate, and their tendency to be easily distracted.

According to Dr. Aldridge, the school, therapy, and Department records that documented C. C.'s numerous behavioral, social, and academic problems when she entered kindergarten in the fall of 2002 were consistent with her almost contemporaneous reports that she had been molested by her biological father before she was placed in foster care. In contrast, the lay witnesses' hearing testimony that described the girls' affectionate, fearless behavior with Darst was inconsistent with the behavior typically observed of children who are being sexually abused in the manner the girls had reported. Similarly, the school, therapy, and Department records

18

that documented C. C.'s emotional, psychological, and academic improvement while living with Darst and Binzel were inconsistent with what would have been expected if she was being molested.

Dr. Aldridge also testified that C. C.'s behavioral problems that arose after the September 2004 custody ruling may not have been the result of molestation but, instead, may have been the result of a condition called "reactive attachment disorder," which results when a small child is neglected or abused to the extent that the child becomes unable to develop a secure bond or attachment to a specific caretaker. In one type of this disorder, a child becomes emotionally distant, avoids eye contact, and does not want to be touched or held. In the other type, a child is uninhibited about seeking attention from others, but is unable overcome his or her feeling of abandonment. Symptoms of this disorder include emotional withdrawal, low self-esteem, depression, aggressiveness, impulsive behavior, lack of remorse, anger, and lashing out. According to Dr. Aldridge, when a previously neglected child, such as C. C., has bonded with a trusted caregiver, but that secure relationship is disrupted, the disorder may develop as a defense mechanism to help the child cope with the change and the feeling of abandonment, leading the child to direct his or her anger at the caregiver.

During the motion for new trial hearing, trial counsel testified that he was aware that expert witness testimony on the behavioral patterns of sexually abused children was admissible in child molestation cases.[16] Even so, when asked why he failed to consult with an expert in this area or to hire an expert to testify on behalf of the defense, trial counsel readily admitted that he had not made a conscious strategic decision about whether to do so. Instead, the use of an expert witness at trial simply had not occurred to him. He also admitted that he did not talk to Darst about using an expert witness and that he had no reason to believe that Darst would have been opposed to hiring one.

Under these circumstances, we conclude that trial counsel's failure to enlist the services of an expert witness constituted deficient performance. See *Goldstein v. State*, 283 Ga. App. 1, 7-8 (3) (b) (640 SE2d 599) (2006) (This Court concluded that trial counsel's performance was deficient based upon, inter alia, his testimony that it

---

[16] See *Hall v. State*, 201 Ga. App. 626, 627 (2) (411 SE2d 777) (1991) ("The 'typical' behavior of sexually abused children is not within the ken of the average juror and is, therefore, a proper matter for expert testimony.") (citation omitted).

20

had "never crossed his mind to consult with medical doctors to determine the validity of opinions expressed by the [S]tate's expert witnesses.").[17]

(iii) Darst also contends that his trial counsel was ineffective for failing to consult with and utilize an expert on the subject of conducting reliable forensic interviews. According to Darst, such an expert would have been able to demonstrate at trial that the statements made by the children during their forensic interviews were unreliable due to the methodology used during the interviews and the contamination that resulted from the repeated questioning of the children by untrained individuals prior to the forensic interviews.

As shown above, before a forensic interview was conducted with either of the children in this case, Binzel, the children's therapist, and two police investigators either questioned them about their outcries or attempted to do so. A sexual abuse medical examination was also conducted on each child. In addition, S. C. was subjected to a psycho-sexual evaluation, and two months passed between her initial

---

[17] Cf. *Gawlak v. State*, 310 Ga. App. 757, 759-760 (2) (a) (714 SE2d 354) (2011) (Trial counsel testified that he had investigated the possibility of utilizing an expert to testify that the victim's behavior was inconsistent with that of a child who had been sexually abused, but he decided not to do so because the testimony would have been inconsistent with his defense theory. This Court concluded that the defendant had failed to demonstrate that trial counsel's strategic decision was unreasonable and that he was prejudiced thereby.).

outcry to Binzel and her forensic interview. As for C. C., before she spoke to anyone else about her allegations, she was subjected to several hours of questioning by Binzel over a two-day period.

At the new trial hearing, appellate counsel presented the testimony of Amy Morton,[18] who, like Dr. Aldridge, was qualified by the trial court as an expert in, inter alia, conducting forensic examinations of children who may have been sexually abused, and who, prior to testifying, reviewed the same case materials as Dr. Aldridge. According to Morton, a forensic interview is essentially "an unbiased search for the truth in a situation where there's a reasonable probability that the information gained from that interview could be presented in court." She explained that children tend to be "suggestible," so interviewers must avoid techniques that can suggest certain answers to their questions, because a child's actual memories of an event can be impacted by suggestive techniques. To that end, she testified that forensic interviewers must be specially trained, unbiased, knowledgeable about the developmental differences between various age groups of children, and generally

_____

[18] The record shows that Morton is a marriage and family therapist with specialized training and at least 25 years of experience in conducting forensic interviews of children who allegedly had been sexually abused and in training others to conduct such interviews. She also provides therapy for children who have been sexually abused.

aware of the child's background and whether the child is taking medication. To help ensure the reliability of the information obtained through the interview, it should be conducted as soon as possible after the child's first outcry in order to minimize memory lapses and reduce the possibility that third parties may intentionally or inadvertently influence the child. This situation frequently occurs when "well-meaning people who question children, who don't have training, who inadvertently break all the rules for how these interviews should be done, and suggest things, even unintentionally, that the child then incorporates into their understanding of their own experience." For example, when an adult either understands or misunderstands what a preschool age child has told them and then repeats what they *think* they heard back to the child, "that can become [the child's] story."

According to Morton, a forensic interviewer should avoid the following: using suggestive statements and leading questions that contain information that the child has not yet disclosed; selective reinforcement of the child's statements, i.e., communicating to the child, either verbally or through your demeanor, approval or disapproval of what the child is saying; "co-opting" the child, i.e., encouraging the child to help in the investigation; using a type of "peer pressure" by telling the child that a sibling or someone else has already talked about the issue; and using

23

anatomical drawings and dolls before the child discloses abuse, because premature use of the tools may improperly influence the child. Finally, the interview should be recorded or otherwise objectively documented in order to later assess the reliability of the interview process.

During her testimony, Morton offered a few criticisms of the forensic interviews at issue in this case. For example, she expressed some concern that the Department case manager was allowed to be present throughout S. C.'s interview and that S. C. was allowed to sit on the manager's lap. The primary focus of Morton's testimony, however, was her harsh criticism of the professionals in this case, including the therapist, the Department case manager, the police investigators, and the psycho-sexual evaluator, each of whom allowed the children to be subjected to repeated, suggestive questioning about the allegations, instead of ensuring that forensic interviews of the children were conducted without unnecessary delay. According to Morton, the "ball got dropped" by these professionals. Morton characterized the circumstances as a "collection of error[s]" that began when S. C. made her outcry to Binzel, stating that "[i]t is not one person's fault, it is a collective[,] building situation where these children . . . did not get the care and

attention needed in a timely manner to make it most possible that they would provide reliable information."

Morton was also extremely critical of Binzel's post-outcry interactions with both children, especially her prolonged, intensive questioning of C. C. She described Binzel as an untrained interviewer whose participation was suggestive, biased, antagonistic, and threatening, and opined that Binzel's influence was one of the factors that rendered the children's statements unreliable.[19]

Significantly, Darst's trial counsel failed to address any of these issues in his cursory cross-examination of the forensic examiner.[20] During the new trial hearing, he testified that he had watched the recordings of the children's interviews repeatedly with Darst, and he did not see anything that he thought was an improper interviewing

---

[19] Similarly, the other expert witness, Dr. Aldridge, testified that she believed the children's purported memories of Darst's molestation likely resulted from the numerous, suggestive interviews that occurred prior to the forensic interviews and injected improper third party influences, thereby contaminating the children's original memories.

[20] The record shows that, during trial counsel's cross-examination of the forensic interviewer, he asked only three questions, all about whether the interviewer had talked with either of the children before the interviews. The interviewer responded that, other than what was said when she went into the waiting room and brought the children, separately, into the interview room, everything she and the children said to one another was on the recordings of the interviews.

technique or that suggested that the children's statement had resulted from coaching. Even so, as noted in the previous subsection, trial counsel admitted that he did not make a conscious strategic decision about whether to consult with or hire an expert to offer an opinion on the reliability of the interviews, that he simply had not considered the option of using such an expert witness at trial, and that he had never discussed the issue with Darst.[21]

As in the previous subsection, we conclude that, under the circumstances presented, trial counsel's failure to enlist the services of an expert witness constituted deficient performance. See *Goldstein v. State*, 283 Ga. App. at 7-9 (3) (b) (Testimony from credible, objective experts was available to trial counsel before trial to substantially undermine the State's case. Yet, for no strategic reason, counsel failed to present the evidence at trial, so the jury was left with the impression that the opinions of the State's expert witnesses were unassailable. Under these circumstances, this Court concluded that trial counsel's failure to seek and present

---

[21] Although trial counsel added that presenting such expert testimony at trial might require him to play the recordings for the jury a second time, which would not have been favorable to Darst, almost all of the opinion testimony offered by Amy Morton, the expert retained by appellate counsel, was directed at the events *preceding* the forensic interviews and their negative effect on the reliability of the children's interview statements. The record shows that both Morton and Dr. Aldridge were able to testify during the hearing without replaying the interview recordings.

26

expert testimony to rebut that presented by the State was a crucial omission that fell below the standard of acceptable professional conduct.); see also *Barlow v. State*, 270 Ga. 54 (507 SE2d 416) (1998); *Weeks v. State*, 270 Ga. App. 889, 894 (3) (608 SE2d 259) (2004).[22]

(iv) Darst contends that trial counsel's failure to object to certain testimony constituted ineffective assistance. Specifically, Darst argues that counsel should have objected to inadmissible hearsay testimony that the children's biological father and uncle had successfully completed psycho-sexual evaluations, as well as hearsay testimony that there had been a recommendation that he submit to a psycho-sexual

---

[22] Cf. *Gawlak v. State*, 310 Ga. App. at 758-759 (2) (a) (Trial counsel testified that he had investigated the possibility of utilizing an expert to testify that about proper child interviewing techniques but decided that he would address the interview issues by cross-examining the State's expert witnesses, who had conducted the interviews. The record showed that counsel extensively cross-examined those witnesses about the interview techniques at trial. This Court concluded that the defendant had failed to demonstrate that trial counsel's strategic decision not to call an expert witness was unreasonable and that he was prejudiced thereby.); *Towry v. State*, 304 Ga. App. 139, 147 (2) (f) (695 SE2d 683) (2010) (Trial counsel testified that he had reviewed the recording of the victim's interview by a police investigator and that, based upon his training in forensic interviewing techniques and his experience in conducting such interviews when he was a police officer, he concluded that it was unnecessary to utilize an expert witness to testify about forensic interviewing techniques. This Court concluded that the defendant had failed to demonstrate that trial counsel's strategic decision was unreasonable and that he was prejudiced thereby.).

evaluation, but that it was unclear whether he had done so. The following statements are at issue.

First, during cross-examination of the Department case manager who had taken the children to meet with the police investigator after C. C.'s outcry, trial counsel asked the manager if the Department had received a report that someone other than Darst had inappropriately touched the children. The manager responded that, in 2002, after the Department had placed the children in foster care, C. C. had made some statements about possible sexually inappropriate behavior by her biological father when she had lived with him. According to the manager, the behavior at issue was his walking around the house naked in the child's presence, and there were no reports of inappropriate touching, fondling or acts of sodomy by the father.[23] The manager testified that the claim was investigated, the father had previously undergone a psycho-sexual evaluation in Virginia, and the claim was deemed "unsubstantiated."

Second, during the State's questioning of the Department caseworker who had supervised the children's foster placement in Georgia from March to November 2004, the caseworker testified that the children's paternal grandparents, who lived in

---

[23] As shown in Division 2 (a) (i), supra, however, the Department's records actually showed that C. C. had reported that her biological father had slept with her while he was naked and had touched her "privates."

Pennsylvania, had completed foster parent training and other state-mandated requirements in support of their efforts to get permanent custody of the children. According to the caseworker, because the children's biological father and a paternal uncle would have contact with the children if they were placed in their grandparents' custody, the men were ordered to complete psycho-sexual evaluations.[24] The caseworker testified that both men completed the evaluations and "there were no red flags," so the men were allowed to have supervised contact with the children if the grandparents obtained custody.

Finally, during direct examination by the State, the caseworker testified that, as a result of S. C.'s outcry about inappropriate sexual acts by Darst, it had also been recommended that Darst undergo a psycho-sexual evaluation. The caseworker testified, however, that she did not know if he had completed the evaluation.

It is undisputed that the professional(s) who conducted the psycho-sexual evaluations on the children's biological father and "Uncle Billy" did not testify at trial and that neither of the Department employees who testified about those evaluations

---

[24] Notably, during cross-examination of the caseworker, defense counsel elicited her testimony that S. C.'s statements to the children's therapist about inappropriate sexual behavior by her "Uncle Billy" was the reason he was ordered to undergo a psycho-sexual evaluation.

29

had any actual personal knowledge of what occurred during those purported out-of-state evaluations. Further, there is nothing in the record to show that the caseworker had any personal knowledge about Darst's alleged referral for a psycho-sexual evaluation and, if she was relying on a document in the Department's records, that document was never admitted at trial. Under these circumstances, the witnesses' testimony about whether Darst, the children's biological father, or "Uncle Billy" participated in and/or passed a psycho-sexual evaluation constituted inadmissible hearsay. See former OCGA § 24-3-1 (a) ("Hearsay evidence is that which does not derive its value solely from the credit of the witness but rests mainly on the veracity and competency of other persons.");[25] *In the Interest of C. A.*, 316 Ga. App. 185, 189-190 (728 SE2d 816) (2012) (The diagnostic opinion of a third party who was not available for cross-examination, as well as a Department caseworker's testimony that was based entirely upon reports of third parties who were not available for cross-examination, constituted inadmissible hearsay.); *In the Interest of C. D. E.*, 248 Ga.

_____

[25] In 2011, the Georgia General Assembly repealed the existing Evidence Code in its entirety and replaced it with a new Evidence Code, the provisions of which became effective on January 1, 2013, and apply to any motion, hearing or trial commenced on or after such date. Ga. L. 2011, p. 99, §§ 1, 101. Pursuant to that legislative act, "hearsay" has been redefined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OCGA § 24-8-801 (c) (2013).

App. 756, 764 (2) (546 SE2d 837) (2001) ("[R]ecords which contain diagnostic opinions of third parties who are not available for cross-examination are generally inadmissible.") (punctuation and footnote omitted).

Thus, trial counsel erred in failing to object to these references to psycho-sexual evaluations.[26] Even absent an objection, however, the testimony lacked any probative value and should not have been presented for the jury's consideration. *Grindle v. State*, 299 Ga. App. 412, 417 (1) (b), n. 4 (683 SE2d 72) (2009) ("Hearsay testimony is not only inadmissible but wholly without probative value, and its introduction without objection does not give it any weight or force whatever in establishing a fact.") (citation and punctuation omitted); *In the Interest of C. D. E.*, 248 Ga. App. 756, 764 (2) (546 SE2d 837) (2001) ("[H]earsay evidence has no probative value even when it is admitted without objection.") (footnote omitted).

(b) *Did the collective effect of trial counsel's errors prejudice Darst?*

In determining whether the collective effect of trial counsel's deficient performance, as described above, prejudiced Darst's defense, we reach the following conclusions.

---

[26] Trial counsel testified that his failure to object to the evidence was not the result of a strategic decision.

Because trial counsel failed to petition the trial court to subpoena the children's Department records, he was unable to show the jury that, not only did C. C.'s biological father walk around in front of her while nude, but that he allegedly molested her by touching her "privates," which would have provided significant support for Darst's defense theory that she had been molested by someone else. The numerous records documenting the children's negative behavioral changes following their summer 2004 visit to Pennsylvania and the September 2004 change of custody ruling would have supported Dr. Aldridge's testimony about alternative explanations for their behavior besides molestation. Similarly, Dr. Aldridge's testimony that the children's behavior around Darst was inconsistent with their reports that he molested them (testimony which was clearly favorable to Darst's defense) was almost entirely dependent on her review of the records at issue, as well as the lay witness testimony presented during the hearing.

Further, Morton's expert testimony about the many factors that may have improperly influenced the children's memories and, in her opinion, reduced the reliability of their forensic interview statements and trial testimony supported Darst's contention that the children's allegations against him were not credible.

Finally, the improper presentation of hearsay evidence regarding the lack of "red flags" resulting from the psycho-sexual evaluations of the biological father and "Uncle Billy" essentially eliminated them as possible molestation suspects and, as a result, severely undermined one of Darst's primary defense theories, a fact the State specifically emphasized in its closing argument.

Consequently, we conclude that Darst has met his burden of demonstrating that, absent trial counsel's errors, there is a reasonable probability that the outcome of the trial would have been different. *State v. Worsley*, __ Ga. at __ (3); *Schofield v. Holsey*, 281 Ga. at 812 (II), n. 1; see *Perkins v. Hall*, 288 Ga. 810, 812-818 (II) (708 SE2d 335) (2011) (the collective effect of trial counsel's errors resulted in the reversal of the defendant's death sentence); *Goldstein v. State*, 283 Ga. App. at 1, 7-9 (3) (b) (In reversing the denial of the defendant's motion for new trial, the Court concluded that, "although trial counsel was experienced and generally able, his assistance in this trial was ineffective, particularly because he inexplicably failed to present evidence known to him that bears on several important issues and which could have changed the outcome of the trial.").[27]

---

[27] See also *Terry v. Jenkins*, 280 Ga. 341, 347-348 (2) (c) (627 SE2d 7) (2006) ("Whatever our own opinions may be about the verdict in this case, we conclude, in agreement with the habeas court, that there is a reasonable probability that the jury

It follows that, although the evidence was sufficient to support Darst's convictions, the trial court erred in finding that Darst did not receive ineffective assistance of counsel and, as a result, in denying his motion for new trial. We remand this case to the trial court for a new trial. See *Green v. State*, 291 Ga. 287, 288-289 (1) (728 SE2d 668) (2012) ("[W]ith rare exceptions, where a defendant was deprived of effective assistance of counsel[,] but the evidence was nevertheless sufficient to convict, the proper remedy is to reverse [the] defendant's conviction and remand the matter for a new trial.") (citation and punctuation omitted).

3. As a result of our rulings on Darst's ineffective assistance claims, his remaining allegation of ineffective assistance of counsel is moot. *Goldstein v. State*, 238 Ga. App. at 10 (4). Similarly, Darst's contention that the trial court erred in failing to excuse four jurors for cause, is moot. Id.

*Judgment reversed. Phipps, C. J., concurs. Branch, J., concurs in the judgment only.*

---

would have reached a different verdict in the guilt/innocence phase of trial if confronted with the evidence presented by habeas counsel that trial counsel failed to obtain.").